CASE NO. 05-4000

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

SANDRA S. HILLERY
Plaintiff - Appellant

v.

METROPOLITAN LIFE INSURANCE COMPANY;
THE LIMITED LONG-TERM DISABILITY PROGRAM.
Defendants-Appellees

On Appeal From The United States District Court
For The Eastern District Of Missouri
Case Number 4:04CV01718CDP
_____

JOINT RESPONSE BRIEF OF APPELLEES
THE LIMITED LONG-TERM DISABILITY PROGRAM AND
METROPOLITAN LIFE INSURANCE COMPANY
_____

ARMSTRONG TEASDALE LLP
Ann E. Buckley
One Metropolitan Square, Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 621-5065 (facsimile)




ATTORNEYS FOR
DEFENDANT-APPELLEE
METROPOLITAN LIFE
INSURANCE COMPANY

VORYS, SATER, SEYMOUR AND
PEASE LLP
David A. Campbell
Michael J. Settineri
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street
Columbus, Ohio 43215
Phone:  (614) 464-6400
Fax:  (614) 719-5146


ATTORNEYS FOR
DEFENDANT-APPELLEE
THE LIMITED LONG-TERM
DISABILITY PROGRAM

January 27, 2006

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Plaintiff-Appellant Sandra Hillery ("Hillery") asserts a claim for benefits under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Specifically, Hillery claims Defendant-Appellee Metropolitan Life Insurance Company ("MetLife") improperly terminated her long-term disability ("LTD") benefits under the Limited Long-Term Disability Program (the "Plan").

MetLife terminated Hillery's benefits in 2003 after determining that the medical evidence no longer supported her claim that she was Totally Disabled. In reaching that conclusion, MetLife relied on Hillery's own treating physician's statement that her lupus was no longer active as well as the opinions of four independent physicians who all concluded that Hillery's medical conditions would not prevent her from working in a sedentary to light-duty position.

After the benefits termination, Hillery filed this action in the District Court for the Eastern District of Missouri. The District Court granted summary judgment in favor of MetLife and the Plan, finding that MetLife's decision was reasonable and supported by substantial evidence from the administrative record. Hillery appeals that judgment.

Appellees request oral argument of 20 minutes per side.

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, Defendant-Appellee Metropolitan Life Insurance Company states that it is owned 100% by MetLife, Inc., a publicly-held company.

Appellate Case: 05-4000     Page: 3     Date Filed: 01/27/2006 Entry ID: 2003589

# TABLE OF CONTENTS

**PAGE**

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ................................................................. i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES ....................................................................v

I.    STATEMENT OF ISSUES ............................................................1

ISSUE ONE ..........................................................................................1

ISSUE TWO .........................................................................................1

II.   STATEMENT OF THE CASE ......................................................2

III.  STATEMENT OF FACTS ............................................................3

IV.   SUMMARY OF ARGUMENT ....................................................19

V.    ARGUMENT ..............................................................................20

      A.    Standard of Review ...........................................................20

      B.    The District Court Properly Applied An Abuse Of
            Discretion Standard Of Review.........................................20

            1.    MetLife conducted a thorough review of the
                  relevant medical records ..........................................22

            2.    MetLife properly relied on Dr. Samudrala's IME ...................24

            3.    MetLife considered Hillery's treating physicians'
                  opinions. ...................................................................27

            4.    MetLife did consider Hillery's subjective
                  complaints ................................................................29

      C.    The District Court Did Not Err By Finding That MetLife
            Did Not Abuse Its Discretion When Terminating
            Hillery's Benefits ..............................................................32

iii

VI.    CONCLUSION..............................................................................43

VII.   CERTIFICATE OF SERVICE...................................................45

VIII.  CERTIFICATE OF COMPLIANCE WITH RULE 32(a)...........................46

Appellate Case: 05-4000    Page: 5    Date Filed: 01/27/2006 Entry ID: 2003589

# TABLE OF AUTHORITIES

**PAGE**

## CASES

Barnhart v. Unum Life Ins. Co. of Am., 179 F.3d 583 (8th Cir. 1999).............. 1, 21

Berg v. Norand Corp., 169 F.3d 1140 (8th Cir.1999) ............................................21

Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003) ............. 1, 29, 38, 42

Bowman v. Barnhart, 310 F.3d 1080 (8th Cir. 2002)...............................................37

Bremer v. Hartford Life and Accident Ins. Co., 16 F.Supp.2d 1057 (D.
      Minn. 1997)....................................................................................................35

Buttrum v. Central States, S.E. & S.W. Areas Health & Welfare Fund,
      76 F.3d 896 (8th Cir. 1996) ....................................................................... 22, 27

Cash v. Wal-Mart Group Health Plan, 107 F.3d 637 (8th Cir. 1997) .......... 1, 32, 44

Coker v. Metropolitan Life Ins. Co., 281 F.3d 793 (8th Cir. 2002) ................ passim

Fletcher-Merrit v. Noram Energy Corp., 250 F.3d 1174 (8th Cir.
      2001) ..............................................................................................................32

Harden v. Amer. Express Finan., 384 F.3d 498, 500 (8th Cir. 2004) ....................24

Hensley v. International Business Machines Corp., 123 Fed. Appx.
      534, 539 (4th Cir. 2004) ..................................................................................27

Hunt v. Metropolitan Life Ins. Co., 425 F.3d 489, 491 (8th Cir. 2005)........... 34, 38

Layes v. Mead Corporation, 132 F.3d 1246 (8th Cir. 1998) ............................ 32, 44

McGee v. Reliance Standard Life Ins. Co., 360 F.3d 921 (8th Cir.
      2004) ......................................................................................................... 29, 38

Neumann v. AT&T Communications, Inc., 376 F.3d 773 (8th Cir.
      2004) ......................................................................................................... 22, 27

Orion Fin. Corp. of S.D. v. Amer. Foods Group, Inc., 281 F.3d 733
      (8th Cir.2002).................................................................................................21

v

Orr v. Wal-Mart Stores, Inc., 297 F.3d 720 (8th Cir. 2002)....................................21

Pralutsky v. Metropolitan Life Ins. Co., _____ F.3d _____, 2006 WL
  130935  (8th Cir. 2006).............................................................. passim

Sahulka v. Lucent Technologies, Inc., 206 F.3d 763 (8th Cir. 2000) ........ 24, 25, 32

Shelton v. ContiGroup Cos., 285 F.3d 640 (8th Cir.2002)....................................21

Woo v. Deluxe Corp., 144 F.3d 1157 (8th Cir. 1998)...................................... 21, 22

## **STATUTES**

29 U.S.C. § 1132(a)(1)(B) ..............................................................................2

## **OTHER AUTHORITIES**

*American Academy of Physical Medicine & Rehabilitation* ............................ 12, 25

*Attorneys Medical Deskbook* 3d § 11:2 (1993) ........................................13

*Lawyers' Medical Cyclopedia of Personal Injuries and Allied
  Specialties*, Fifth Edition .......................................................... 12, 25

Appellate Case: 05-4000     Page: 7     Date Filed: 01/27/2006 Entry ID: 2003589

# I.    STATEMENT OF ISSUES

Defendants-Appellees, the Plan and MetLife, respectfully submit the following restatement of the issues submitted by Plaintiff-Appellant, Hillery.

## ISSUE ONE

Did the District Court err by not applying a less-deferential form of the abuse of discretion standard of review?

> Barnhart v. Unum Life Ins. Co. of Am., 179 F.3d 583 (8th Cir. 1999)
>
> Pralutsky v. Metropolitan Life Ins. Co., ____ F.3d ____, 2006 WL 130935 (8th Cir. 2006)
>
> Coker v. Metropolitan Life Ins. Co., 281 F.3d 793 (8th Cir. 2002)

## ISSUE TWO

Did the District Court err by finding that MetLife's decision to terminate Hillery's long-term disability benefits was supported by substantial evidence and did not constitute an abuse of discretion?

> Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 640-641 (8th Cir. 1997)
>
> Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830-831 (2003)
>
> Coker v. Metropolitan Life Ins. Co., 281 F.3d 793 (8th Cir. 2002)

## II.    STATEMENT OF THE CASE

This matter arises under 29 U.S.C. § 1132(a)(1)(B) and is brought by Plaintiff-Appellant Sandra S. Hillery who alleges that MetLife improperly terminated long-term disability benefits she was receiving under the Plan. Hillery received benefits under the Plan from 1992 to 2003. After exhausting administrative remedies, Hillery filed suit in the District Court, on December 10, 2004, seeking a reversal of the benefits termination.

After the parties filed cross-motions for summary judgment, the District Court upheld the termination of benefits on September 26, 2005. In reaching its decision, the District Court found that MetLife's decision was supported by substantial evidence from the administrative record. In doing so, the District Court rejected all of Hillery's arguments, determining that MetLife fully considered Hillery's subjective symptoms and her ability to reenter the workforce. The District Court then granted MetLife and the Plan's joint motion for summary judgment and dismissed Hillery's claims. Hillery now appeals to this Court.

Appellate Case: 05-4000     Page: 9     Date Filed: 01/27/2006 Entry ID: 2003589

### III. STATEMENT OF FACTS

The Plan is a welfare benefit plan subject to ERISA. The Plan's formal terms are set forth in the document titled "The Limited Long-Term Disability Program." <u>See</u> Administrative Record at ML00001 to ML00017 (hereinafter referred to as "ML___"). The Plan provides disability benefits to eligible participants and the Plan's terms are summarized in its summary plan description, The Guide. ML00878 to ML01008. Plan benefits are paid out of a trust funded by contributions from the Plan sponsor, The Limited Service Corporation. ML00994.

To receive benefits, a participant must be "totally disabled." ML00009. The Plan defines "Total Disability" to mean that a Plan Participant:

(a)     is under the regular care of a Physician; and

(b)     as a result of an Illness/Injury having an Onset Date while the Participant is a Participant:

(i)     during the twelve (12) months immediately following the Benefit Commencement Date, the Participant is unable to perform any and every duty related to the Participant's regular occupation in which he or she was engaged immediately prior to the occurrence of the Illness/Injury;

(ii)     ***thereafter, the Participant cannot work at any gainful occupation for which the Participant is reasonably qualified, or could become qualified, by education, experience or training.***

ML00007 (emphasis added).

MetLife, as the Plan's claims administrator, is responsible for determining whether a participant is "totally disabled." ML00005. The Plan explicitly confers

3

on MetLife discretionary authority to interpret the terms of the Plan and to determine eligibility for benefits under the Plan. Id. Specifically, section 2.7 of the Plan provides:

> The Claims Administrator [MetLife] shall have discretionary authority to determine eligibility for [Plan] Benefits under the [Plan], to construe the terms of the [Plan] and to make determinations regarding appeals of denied claims for [Plan] benefits.

Id.

Hillery started work as a co-manager for Victoria's Secret Stores on October 21, 1990. ML00451. Hillery worked for a little over five months until, on April 5, 1991, she ceased working based on her family practitioner's (Dr. Martha Miller) diagnosis of systemic lupus. ML00451; ML00475. Hillery was subsequently approved to receive disability benefits under the Plan. ML00020.

Thereafter, MetLife continued to monitor Hillery's progress. See e.g. ML00466. In an Attending Physician's Statement completed on or around January 3, 1992, Dr. Miller reaffirmed her diagnosis of systemic lupus and noted Hillery's subjective complaints as pain in joints, swelling and oral ulcers. ML00466. Dr. Miller noted her objective findings as "oral ulcers in mouth, joint swelling." Id. Dr. Miller also noted that Hillery could sit without limitations but should completely avoid standing. Id.

On August 6, 1992, Dr. Miller completed another Attending Physician's Statement for MetLife. ML00475 to ML00476. Dr. Miller maintained her

4

diagnosis of systemic lupus and noted Hillery's subjective symptoms as joint pain, weakness, numbness and tingling. ML00475. Dr. Miller noted her objective findings as positive ANA, neuropathy and an electromyogram ("EMG"). Id. In listing Hillery's restrictions, Dr. Miller stated that Hillery could not sit, stand, walk or lift any weight whatsoever. ML00476.

Concurrent with Dr. Miller's treatment, Hillery received treatment from Dr. Kenneth Wiesner, a rheumatologist, who first examined Hillery on March 19, 1992. ML00410 to ML00413. In an Attending Physician's Statement completed on or around February 1993, Dr. Wiesner diagnosed Hillery with systemic lupus erythematosus ("SLE"), peripheral neuropathy and left foot sympathetic dystrophy. ML00513 to ML00514. Dr. Wiesner listed Hillery's subjective symptoms as joint pain, fatigue, neuropathy, lumbar degenerative disc disease, paresthesias and carpal tunnel. Id. Dr. Wiesner's objective findings were rash, positive ANA and Raynauds. Id. Dr. Wiesner stated that Hillery was able to sit continuously for 2-3 hours, stand continuously for ½ to 1 hour, walk continuously for ½ to 1 hour and lift up to 30 lbs occasionally. ML00514.

On July 9, 1993, Dr. Wiesner again submitted an Attending Physician's Statement to MetLife. ML00511 to ML00512. Dr. Wiesner diagnosed Hillery with systemic lupus, positive ANA, paresthesias of both hands, carpal tunnel, status post foot fracture and lumbar spine pain. ML00511. Dr. Wiesner also listed

5

Hillery's subjective symptoms as headaches, cramping, swelling and pain in the face and joint pain. Id. Dr. Wiesner's objective findings were tender, swollen parotids, rash, Raynauds and positive ANA. ML00511. Dr. Wiesner also noted that Hillery was able to sit 2-3 hours continuously, stand ½ to 1 hour continuously, walk ½ to 1 hour continuously, lift up to 10-20 pounds occasionally and 0 to 10 pounds frequently. ML00512.

On March 23, 1995, Dr. Wiesner completed another Attending Physician's Statement at MetLife's request. ML00360 to ML00361. Dr. Wiesner listed Hillery's diagnosis as systemic lupus erythematosus, positive ANA, parathesias of the hands and feet, carpal tunnel, lower back pain, headaches, facial rash and Sjogren's without SSA or SAB. Id. Dr. Wiesner listed Hillery's subjective symptoms as facial swelling, muscle cramping, headaches and joint pain. Id. Dr. Wiesner's objective findings were diffuse trigger point tenderness, rash, Raynauds and abnormal lab results. ML00360. Dr. Wiesner again stated that Hillery was able to sit 2-3 hours continuously, stand ½ to 1 hour continuously, walk ½ to 1 hour continuously, lift up to 10-20 pounds occasionally and 0 to 10 pounds frequently. ML00361.

Dr. Wiesner completed his last Attending Physician's Statement on or around July 1996. ML00352 to ML00353. Dr. Wiesner stated that Hillery's diagnosis was systemic lupus erythematosus and fibromyalgia. ML00352.

6

Dr. Wiesner stated that Hillery's subjective symptoms were joint pain and fatigue. Id. Dr. Wiesner's objective findings were trigger point tenderness. Id. Dr. Wiesner stated that Hillery could sit for ½ hour, stand no more than ½ hour, walk no more than ½ hour and lift up to ten pounds. ML00353.

On June 25, 1999, Dr. Wilmer Sibbitt, a rheumatologist, provided an assessment of Hillery's condition to Dr. Mark Werner. ML00230 to ML00232. Dr. Sibbitt's assessment included a finding of systemic lupus erythematosus with continued arthralgias, fatigue and intermittent cognitive difficulties. ML00231. Dr. Sibbitt also noted other conditions Hillery was suffering from, including neuropathic symptoms "that appear to be peripheral neuropathy, secondary Sjogren's, hypothyroidism, asthma, low back pain and fibromyalgia." ML00231.

On March 8, 2000, Dr. Eileen Hammar, a family practitioner, completed an Attending Physician Statement for MetLife. ML00228 to ML00229. Dr. Hammar listed Hillery's diagnosis as systemic lupus erythematosis with a secondary diagnosis of peripheral neuropathy of the legs. ML00228. Dr. Hammar listed Hillery's subjective symptoms as weakness, dry mouth, painful joints, headaches, asthma and chest pain. ML00229. Dr. Hammar stated that Hillery could sit for 4 hours intermittently, stand 1 hour intermittently and walk 2 hours intermittently and lift up to 20 pounds occasionally. Id. Dr. Hammar opined that Hillery could not work. Id.

7

Dr. Hammar completed another Attending Physician's Statement on October 18, 2001. ML00217 to ML00218. Again, Dr. Hammar listed Hillery's diagnosis as systemic lupus erythematosis with a secondary diagnosis of peripheral neuropathy of the legs. ML00217. Dr. Hammar also was generally consistent in her observations of Hillery's physical abilities and limitations, stating that Hillery could sit for 4 hours continuously, stand 2 hours intermittently and walk 1 hour intermittently, lift up to 10 pounds frequently and lift 50 pounds occasionally. ML00218. Dr. Hammar again opined that Hillery could not work. Id.

Concurrent with Dr. Hammar's treatment of Hillery, Dr. Jacqueline Dean, a rheumatologist, met with Hillery on April 2, 2002 to follow up on "FMS and SLE." ML00204. In her notes, Dr. Dean noted that she and Hillery "went over her labs which looked good. Just showed a positive ANA with a normal C3, C4 and anti-DNA." ML00204. As well, Dr. Dean noted that her impression and plan was:

> ***Lupus. This does not appear to be active. Again, we discussed sun avoidance and rest. FMS. This seems to be the bulk of her problems.*** I would like her to do PT, take Ultracet up to quid. She was given a prescription. Continue stretching and gradually increase her walking regimen over the summer. Follow up with me in 3 months.

ML00204 (emphasis added).

Thereafter, Hillery moved to Missouri and came under the care of Dr. Eileen Lamb (family practitioner) and Dr. Terry Moore (rheumatologist). See ML00178. Continuing its ongoing responsibility to monitor Hillery's continued eligibility for

8

Plan benefits, MetLife requested medical records from Dr. Moore (ML00656) and

Dr. Lamb on February 5, 2003 (ML00657).

According to Dr. Moore's records, he examined Hillery on November 21,

2002 and January 14, 2003. ML00084 to ML00086. Dr. Moore's initial

November 21, 2002 physical examination lists the following findings:

> On physical examination (November 21 2002), her blood pressure
> was 138/84, temperature was 98.7 degrees, weight was 189 pounds,
> and her weight [sic] was 65 inches. Her skin showed dry skin patches
> and a mild livedo reticularis pattern. Her cranium was normocephalic
> and atraumatic. Her pupils were equal, round, and reactive to light.
> Her ears and nose showed no ulcers. Her mouth and throat showed
> no ulcers. Her neck was supple, no cervical lymphadenopathy or
> organomegaly were noted. She did have tenderness all along her
> vertebrae. Her chest was clear to auscultation bilaterally. Her heart
> was in regular rate and rhythm with a systolic murmur. Her abdomen
> was soft, bowel sounds were present, and no tenderness, rigidity, or
> guarding was noted. She reported tenderness of all of the small joints
> of her left hand as well as the second, third, and fourth DIPs of the
> right hand and the first PIP and MCP of the right hand. She had
> bilateral elbow tenderness and bilateral shoulder tenderness.
> Otherwise, none of these joints had any swelling. The other joints
> including the other DIPs, PIPs, MCPs, wrists, hips, knees, ankles, and
> tarsal joints were free of any tenderness or swelling. She had 18/18
> tender points. Neurologically, her cranial nerves II through XII were
> intact, power was 5/5 in all four extremities, deep tendon reflexes
> were 2/4, proprioception and vibration senses were intact, and her
> grip strength was assessed to be 100% bilaterally.

ML00085.

Dr. Moore's notes of his January 14, 2003 follow-up examination of Hillery

show that Hillery reported "no significant morning stiffness, but ongoing joint pain

in her knees, left shoulder, and upper back region." ML00085 to ML00086.

9

Hillery stated that "she was having some swelling in her hands, ongoing Raynaud's symptoms, dry eyes, dry mouth, shortness of breath and chest pain." ML00086.

Dr. Moore listed Hillery's lab findings as follows:

> Her labs from December 7, 2002 showed normal chemistries with the BUN of 9 and creatinine of 0.6, ALT of 1, AST of 16, total protein of 7.7, albumin of 4.1, and globulin of 3.6. Her CBC showed a WBC count of 7,200, hemoglobin of 14.4 g/dL, and platelets of 320,000. Her CK was 71 and aldolase was 3.3. Rheumatoid factor was 7, CRP was 0.27, and ESR was 12 mm/hr. Her urinalysis was normal. Her TSH was 1.59. Her 24-hour urine for creatinine clearance was 121 ml/min with a protein spillage of only 52 mg/24 hours. Her ANA was 1:640 titer, but her panel was negative including antibodies to Sm, RNP, SS-A, SS-B, and ds-DNA. Her C3 was 147, C4 was 37, and CH50 was 56. Her antiribosomal-P antibody was normal at 8. Her lupus anticoagulant was negative as were her anticardiolipin antibodies IgG and IgM, and antibodies to beta-2 glycoprotein IgG and IgM had been requested but the results were unavailable.

> On physical examination (01/14/03), her blood pressure was 124/86 and weight was 193 pounds. Her pupils were equal, round and reactive to light. Her chest was clear to auscultation bilaterally. Her heart was in regular rate and rhythm without murmurs, rubs, or gallops. Her abdomen was soft, bowel sounds were present, and no tenderness, rigidity, or guarding was noted. ***On musculoskeletal examination, she had tenderness of bilateral shoulders, the other joints were free of any tenderness or swelling.***

ML00086 (emphasis added).

Dr. Moore's impression was that Hillery did not have "any lupus activity at this time" and that she should continue using Tylenol on an "as needed basis." ML00086. As to her Raynaud's type symptoms and history of fibromyalgia, Dr. Moore encouraged "precautions against cold weather, restorative sleep and

Appellate Case: 05-4000     Page: 17     Date Filed: 01/27/2006 Entry ID: 2003589

water aerobics."[1]  Id.  Dr. Moore requested that Hillery follow-up in four months for "further evaluation and recommendations."  Id.

Dr. Lamb, a family practitioner, completed an Attending Physician's Statement dated January 29, 2003 diagnosing Hillery with systemic lupus erythematosus and peripheral neuropathy.  ML00648 to ML00650.  Dr. Lamb stated that Hillery was unable to work due to ongoing inflammatory arthritis, chronic pain and cognitive difficulty.  ML00650.  Dr. Lamb stated that Hillery could sit for 2 hours intermittently, stand for 1 hour intermittently and walk 1 hour intermittently.  Id.  Dr. Lamb also stated that Hillery could lift up to 10 pounds occasionally and could drive a vehicle.  Id.

After receiving Dr. Lamb's and Dr. Moore's statements, MetLife requested that Dr. Gary Greenhood, an independent physician consultant, review Hillery's medical file.  ML00735 to ML00738, Appellees' Joint Appendix at A-1 to A-4.[2] Dr. Greenhood concluded that Hillery "does have lupus, [but] there is no evidence of a recent flare of [the] disease."  ML00736, A-2.  "There is no indication of complications associated with lupus (such as renal dysfunction, severe lung

---

[1] Hillery in her Statement of Facts, claims that Dr. Moore stated that Hillery's joint pain "was due to fibromyalgia."  Brief at p. 16.  Dr. Moore made no such statement.  Rather, Dr. Moore found 18/18 tender points and his impression was a history of fibromyalgia.  ML00689.

[2] Hereinafter, Appellees' Joint  Appendix is referenced as "A-__").  Personal identifiers have been redacted.

11

disease, cerebritis, etc.) that would be expected to cause impairment." <u>Id.</u> "[T]here is no documentation that the patient has ongoing, inflammatory arthritis and cognitive difficulty.  Pain associated with fibromyalgia is noted.  However … most patients that have fibromyalgia are capable of work in the sedentary to light categories." <u>Id.</u>

In his report, Dr. Greenhood suggested that an IME be performed by a rheumatologist and/or that surveillance be conducted, if deemed appropriate by MetLife's case manager.  ML00736, A-2.  However, MetLife was unable to find a rheumatologist in Hillery's area that would perform an IME.  <u>See</u> ML00068 to ML00069 (MetLife diary notes).  Instead, a MetLife nurse consultant recommended that Hillery's physical capabilities be assessed by a physiatrist to comment on Hillery's ability to perform sedentary to light job duties.[3]  ML00069.  MetLife then scheduled Hillery for an IME with Dr. Samudrala, Board Certified in Physical Medicine.  ML0074.

---

[3] "Physiatrists focus on restoring function.  They care for patients with acute and chronic pain as well as musculoskeletal problems such as back and neck pain, tendonitis, pinches [sic] nerves and fibromyalgia.  They also treat people who have experienced catastrophic events that result in paraplegia, quadriplegia, or traumatic brain injury, and individuals who have had strokes, orthopedic injuries, or neurologic disorders such as multiple sclerosis, poliomyelitis, or amyotrophic lateral sclerosis (ALS)."  *Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties*, Fifth Edition, at §5.2 page 5-4, <u>citing</u> <u>to</u> *American Academy of Physical Medicine & Rehabilitation,* http://www.aapmr.org. (accessed 4/26/01).

Appellate Case: 05-4000     Page: 19     Date Filed: 01/27/2006 Entry ID: 2003589

On July 30, 2003, Dr. Samudrala conducted a 45-minute physical examination of Hillery in addition to reviewing extensive documentation from Hillery's medical records. <u>See</u> ML00744 to ML00753 (preliminary and final reports). Dr. Samudrala also reviewed Hillery's then present medications, motor skills and conducted a functional assessment. ML00750 to ML00751, A-7 to A-8. Based on her review and examination, Dr. Samudrala concluded that Hillery's subjective complaints were "out of proportion to the clinic and laboratory findings" and that Hillery was capable of light duty work.[4] ML00752, A-9. Dr. Samudrala also completed a Physical Capacities Evaluation noting that Hillery was able to sit 5 hours per day, stand 2 hours per day and walk 1 hour per day. ML00753, A-10. Dr. Samudrala also found that Hillery could lift up to 10 pounds frequently and lift 20 pounds occasionally. <u>Id.</u>

Also relevant to this matter, Dr. Samudrala noted that Hillery exhibited Waddell Signs during the examination.[5] ML00751, A-8. Specifically, Dr. Samudrala noted:

---

[4] Light duty is a higher work capacity than sedentary. ML00746. Also, Hillery claims in her Statement of Facts that Dr. Samudrala "emphasized" that Hillery should go through an aggressive reconditioning program before attempting to go to work. Brief at p. 19. Rather, Dr. Samudrala "recommended" aggressive reconditioning program before returning to work by rehabilitation and work hardening program. ML00752, A-9

[5] "A variety of specialized tests are available that can alert the examiner to the possibility of psychologic distress and/or malingering. The most commonly used

13

1. She exhibits diffuse skin tenderness, hyperesthesia, even to gentle touch.
2. Nonanatomical deep tenderness over wide area of the body.
3. Weakness of muscle groups not explained on localized neurological basis.
4. Overreaction with disproportionate verbalization, facial expression and pain behavior.

ML00751, A-8.

Following Dr. Samudrala's IME of Hillery, MetLife then completed an Employability Assessment Report. ML00574 to ML00575, A-11 to A-12. Based on Dr. Samudrala's determination that Hillery could perform light duty work and considering Hillery's restrictions, the MetLife analyst concluded that Hillery could work at certain sedentary positions including customer complaint clerk, collection clerk, customer order clerk and information clerk/receptionist. Id. In reaching his conclusion, the MetLife analyst considered Hillery's age and reviewed Hillery's own statements regarding her 1967 to 1991 work history in retail sales management. ML00574, A-11. The analyst also identified potential employers in Hillery's local economy (within 21.5 miles). ML00575, A-12.

Thereafter, on September 18, 2003, MetLife terminated Hillery's benefits. ML00571 to ML00573, A-13 to A-15. MetLife based its decision, in part, on the

---

are the Waddell tests, which describe five types of physical signs with specific tests that can be conducted for each. While a positive test in one category is not considered conclusive, when three of the five categories are positive, there is a high probability of nonorganic pathology." *Attorneys Textbook of Medicine,* 3d § 15A.83 (1995).

14

findings of Dr. Moore who noted that Hillery's lupus was not active, the findings of Dr. Samudrala and the Employability Assessment. Id.

On March 14, 2004, Hillery submitted a written appeal to MetLife. ML00772 to ML00773. In support of her appeal, Hillery submitted medical notes from Dr. Gregg J. Berdy (ophthalmologist), medical notes from Dr. James Esther (rheumatologist), EMG studies from Dr. Daniel Phillips (neurologist), medical notes from Dr. Eileen Lamb (rheumatologist) evaluation notes from Dr. Max Benzaquen (neurologist), and medical notes from Dr. Richard DiValerio (rheumatologist). ML00776 to ML00846. Relevant to this matter, Dr. Berdy stated in his notes that Hillery would only need periodic breaks during an eight-hour day to relieve dry eyes as a result of Hillery's Sjogren's syndrome (ML00808). Also, Dr. Phillips stated that his examination of Hillery was "not otherwise impressive for peripheral neuropathy or neuromyopathy." ML00832.

Hillery also submitted to MetLife a letter written by Dr. Esther. ML00848 to ML00849. Dr. Esther stated that Hillery:

> suffers from systemic lupus, erythematosus, has severe diffuse tendonitis, fibromyalgia, severe Raynaud's phenomenon, Sjogrens syndrome, peripheral neuropathy, arthritis related to her connective tissue disease and sinusitis. She is currently maintained on Bextra 10mg daily. Her joints continue to manifest evidence for seropositive polyarticular SLE. She was initially diagnosed with SLE in 1991. ***At the present time she does meet ARA criteria for systemic lupus, her disease is controlled with the use of medications.*** Of recent concern is the fibromyalgia and the increasing joint tenderness.

15

ML00849 (emphasis added).

MetLife then received the independent medical opinion of Dr. Tanya C. Lumpkins, Board Certified in Rheumatology and Board Certified in Internal Medicine. ML00857 to ML00867, A-16 to A-26. Dr. Lumpkins reviewed Hillery's medical file, including Hillery's recent submittals. ML00857 to ML00858, A-16 to A-17. Dr. Lumpkins agreed that the "medical record supports that [Hillery] would fulfill criteria for a diagnosis of systemic lupus erythematosus that would be based on a positive ANA, complaints of the arthralgia, documentation of rash on the face and loosely arthritis or joint complaints."[6] ML00863, A-22. However, Dr. Lumpkins noted that:

> There are insufficient medical records documenting severity of systemic lupus erythematosus or other arthritic condition limiting function in terms of range of motion, muscle strength, or neurologic abnormalities that would lead to significant impairment preventing Ms. Hillery from being able to perform even sedentary positions. The lack of aggressive treatment by multiple rheumatologists in the intervening 12 years would support that the degree of systemic lupus that Ms. Hillery has suffered is mild-to-marginal at best and not of a disabling degree given that she has not sustained internal organ damage or involvement. The wealth of the medical supports minor symptoms affecting myalgias, arthralgias, and fatigue, which while present likely in Ms. Hillery is not of a degree that would prohibit gainful employment of any occupation at least in a sedentary position. From rheumatology perspective, the wealth of the medical

---

[6] Hillery claims in her Statement of Facts that Dr. Lumpkins made no "mention of [Hillery's] fibromyalgia. Rather, as indicated above, Dr. Lumpkins acknowledged that the medical records support symptoms of myalgia but not to a level that would preclude Hillery from working. ML00865, A-24.

Appellate Case: 05-4000    Page: 23    Date Filed: 01/27/2006 Entry ID: 2003589

record does not support an impairment to preclude Ms. Hillery from performing at least a sedentary occupation.

ML00865, A-24.

Dr. Lumpkins also completed an Estimation of Physical Capacities form. ML00866 to ML00867, A-25 to A-26. Dr. Lumpkins opined that Hillery could sit for two hours continuously, stand one hour continuously and walk for ¾ hours continuously. ML00866, A-25. Dr. Lumpkins also opined that Hillery could sit for six hours in an eight hour period, stand for one hour in an eight hour period and walk for two hours in an eight hour period. ML00866, A-25.

Concurrent with Dr. Lumpkins' review, MetLife sought a neurological assessment of Hillery from Dr. Joseph Jares, Board Certified in Neurology. ML00868 to ML00875, A-27 to A-34. Dr. Jares reviewed Hillery's medical records and found that Hillery's "history, physical examination, and testing are consistent with a diagnosis of SLE based primarily upon her subjective symptoms and positive ANA." ML00872, A-31. Dr. Jares noted that Hillery had "been seen by multiple rheumatologic providers, none of whom have detected evidence of active lupus and none of whom have felt it necessary to place her on immunosuppressive therapy." Id. After considering the medical findings, Dr. Jares concluded that "[t]here does not appear to be any corroboration of data with regard to [Hillery's] complaints of headaches, cognitive and memory

17

difficulties and balance and coordination difficulties." ML00872, A-31. Dr. Jares then opined that:

> [f]rom an objective standpoint, the records do not indicate the presence of a neurological process so severe that [Hillery] would be capable [sic] of performing her usual occupation or any occupation for that matter. … In terms of safety issues, [Hillery] does report subjective symptoms of balance difficulties, falling, coordination abnormalities, and therefore should be restricted from working heights or dangerous machinery. It does not appear that there are any restrictions necessary in terms of operating motor vehicles.

ML00872, A-31.

Thereafter, on May 17, 2004, MetLife upheld the termination of Hillery's benefits under the Plan, stating that "[w]e have determined that the medical information provided was insufficient to document that [Hillery's] condition was of a severity to support her inability to perform any gainful occupation." ML00540 to ML00542, A-35 to A-37.

Hillery commenced this action on December 12, 2004, naming only MetLife as a defendant. On May 6, 2005, after a conference with the District Court, Hillery filed an amended complaint naming MetLife and the Plan as defendants. On September 26, 2005, after the parties filed cross-motions for summary judgment, the District Court upheld MetLife's termination of benefits. The District Court then granted MetLife's and the Plan's joint motion for summary judgment and dismissed Hillery's claims.

18

## IV.   SUMMARY OF ARGUMENT

Hillery's primary issue on appeal is whether the District Court erred by finding that MetLife's decision to terminate benefits was supported by substantial evidence.  Specifically, Hillery claims that MetLife did not consider her subjective complaints of disability and her ability to reenter the workforce.  As well, Hillery contends that the District Court should have applied a less-deferential form of the abuse of discretion standard, in part because the independent medical exam performed at MetLife's request was allegedly flawed.

As the District Court found, the evidence in the administrative record refutes every argument asserted by Hillery.  MetLife conducted a thorough review of Hillery's disability status seeking the opinions of four physicians who, after considering Hillery's medical history, subjective complaints and the objective medical evidence, concluded that Hillery was capable of working in at least a sedentary to light-duty position.  Even Hillery's treating physicians' findings support MetLife's decision to terminate Hillery's benefits.  Moreover, the vocational analyst who completed the Employability Assessment Report on Hillery considered her age, education and work history when determining she was capable of reentering the workforce.  The administrative record refutes each and every one of Hillery's arguments.

Appellate Case: 05-4000     Page: 26     Date Filed: 01/27/2006 Entry ID: 2003589

Accordingly, this Court should uphold the District Court's decision. The District Court applied the proper abuse of discretion standard of review because no procedural irregularities existed in the administrative record. As well, the District Court's determination that MetLife did not commit an abuse of discretion when terminating Hillery's benefits is fully supported by the administrative record. Hillery has no basis for ignoring the evidence in the administrative record and her appeal should be denied.

## V.    ARGUMENT

### A.    Standard of Review.

This Court reviews a district court's grant of summary judgment that a plan administrator did not abuse its discretion, de novo. Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998); Barnhart v. Unum Life Ins. Co. of Am., 179 F.3d 583, 587 (8th Cir. 1999). The Court will also review de novo a district court's determination of the proper standard of review of the plan administrator's decision. Id.

### B.    The District Court Properly Applied An Abuse of Discretion Standard Of Review.

As an initial matter, Hillery concedes that "MetLife had discretionary authority under the terms of the [Plan] to deny her benefits[.]" Brief at p. 27. However, Hillery contends that the District Court should have applied the less deferential sliding scale standard of review due to "serious procedural

20

irregularities." Id.  Not only is Hillery precluded from raising this argument for the first time at the appellate court level, but the administrative record clearly refutes any allegation of serious procedural irregularities.[7]

To obtain a less deferential standard of review, a claimant must present "material, probative evidence demonstrating that (1) a palpable conflict of interest or a serious procedural irregularity existed, which (2) cause a serious breach of the plan administrator's fiduciary duty to [the claimant]." Woo v. Deluxe Corp., 144 F.3d at 1160-1161 (citations omitted).    As well, the claimant must also show that "the conflict or procedural irregularity has 'some connection to the substantive decision reached.'"  Id. (citations omitted).  However, the second requirement of the Woo test "presents a considerable hurdle" as plaintiffs must show that the plan administrator "acted dishonestly, acted from an improper motive, or failed to use judgment in reaching its decision[,]"  leading to a serious breach of fiduciary duty. Neumann v. AT&T Communications, Inc., 376 F.3d 773, 781 (8th Cir. 2004) citing Buttrum v. Central States, S.E. & S.W. Areas Health & Welfare Fund, 76

---

[7] Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 725 (8th Cir. 2002) citing Shelton v. ContiGroup Cos., 285 F.3d 640, 643 (8th Cir. 2002); Berg v. Norand Corp., 169 F.3d 1140, 1145 (8th Cir.1999); Orion Fin. Corp. of S.D. v. Amer. Foods Group, Inc., 281 F.3d 733, 740 (8th Cir. 2002) (ordinarily the court will not consider an argument raised for the first time on appeal and will only do so if the newly raised argument is purely a legal issue and requires no additional factual development or if a manifest injustice would otherwise result).

Appellate Case: 05-4000     Page: 28     Date Filed: 01/27/2006 Entry ID: 2003589

F.3d 896, 900 (8th Cir. 1996); <u>Pralutsky v. Metropolitan Life Ins. Co.</u>, ____ F.3d ____, 2006 WL 130935 (8th Cir. 2006).

Hillery attempts to satisfy the <u>Woo</u> test by contending that MetLife committed serious procedural irregularities by (1) failing to review or consider all of Hillery's pertinent medical information, (2) relying on Dr. Samudrala's independent medical examination ("IME") of Hillery, (3) failing to consider Hillery's treating physicians' opinions and (4) failing to consider Hillery's subjective complaints of pain. Not only are Hillery's contentions contrary to the facts in the administrative record, but Hillery points to no evidence of a serious breach of fiduciary duty that affected MetLife's decision. <u>Pralutsky v. Metropolitan Life Ins. Co.</u>, ____ F.3d ____, 2006 WL 130935 at *5 (noting irregularities must be so severe that the court "has a total lack of faith in the integrity of the decision making process") (citation omitted).

## 1. MetLife conducted a thorough review of the relevant medical records.

Hillery's first attempt to show a "serious procedural irregularity" is to claim that MetLife failed to review or consider all of her relevant medical records. Yet, as evidenced by the size of the administrative record, throughout her history of disability, MetLife consistently monitored Hillery's disability status. In fact, the event that triggered MetLife's final review was Hillery's own treating physician's statement that Hillery's lupus was no longer active. ML00204. At that point,

22

MetLife sought the advice of independent physicians (Drs. Greenhood, Samudrala, Lumpkins and Jares), all of whom reviewed Hillery's relevant medical records.

For example, not only did Dr. Samudrala note in her report that extensive documents were mailed to her by MetLife, but she summarized the relevant records in her report including the records given to her by Hillery.[8] ML00748 to ML00749, A-5 to A-6. Likewise, Dr. Greenhood, Dr. Lumpkins and Dr. Jares all reviewed Hillery's medical records in forming their conclusions. See ML00737 to ML00738, A-3 to A-4; ML00857 to ML00875, A-16 to A-34. In fact, both Dr. Lumpkins and Dr. Jares listed over 461 pages of medical records given to them by MetLife, using those records to write a detailed history of Hillery's medical conditions. ML00857 to ML00875, A-16 to A-34. Hillery cannot claim that MetLife did not consider all relevant evidence and MetLife's statement in its May 17, 2004 final determination letter stating that it "reviewed the entire claim

---

[8] Hillery claims in her Statement of Facts and her argument (Brief at p. 29) that MetLife did not give Dr. Samudrala medical documentation from Dr. Hammar, Dr. Lamb, Dr. Wiesner and Dr. Reiss. Yet Hillery, in her August 8, 2003 letter to MetLife attacking Dr. Samudrala's IME (ML00754 to ML00755), complained about Dr. Samudrala's review of both Dr. Reiss' records and Dr. Wiesner's records. Moreover, Dr. Samudrala cited to Dr. Wiesner's medical records in her report and noted that she received extensive records from MetLife as well as records given to her by Hillery on the day of the examination. ML00749, A-6.

file" (ML00541, A-36) is fully supported by the evidence in the administrative record.[9]

## 2. **MetLife properly relied on Dr. Samudrala's IME.**

Hillery's second contention of a serious procedural irregularity is that MetLife improperly relied on Dr. Samudrala's IME. As an initial matter, MetLife did not rely solely on Dr. Samudrala's IME as MetLife had three other independent physicians perform reviews of Hillery's medical records. Regardless, a review of the administrative record shows that Hillery has no basis for attacking Dr. Samudrala's IME.

MetLife scheduled Hillery for an IME after Dr. Greenhood conducted an independent medical review and concluded that Hillery could work in a sedentary or light-duty category. ML00736, A-2. Dr. Greenhood suggested that an IME be performed by a rheumatologist and/or that surveillance be conducted, if deemed

---

[9] Hillery cites to Harden v. Amer. Express Finan., 384 F.3d 498, 500 (8th Cir. 2004) and to Sahulka v. Lucent Technologies, Inc., 206 F.3d 763, 769 (8th Cir. 2000) to infer that MetLife had a duty to investigate, obtain and consider all available medical evidence. However, Harden was a case of limited circumstances (as noted by the court), involving an administrator's failure to obtain social security records after leading the claimant to believe the records had been obtained. Harden v. Amer. Express Finan., 384 F.3d at 500. Likewise, although the Sahulka court noted that a lack of a thorough investigation can result in a serious, procedural irregularity, the court then held that "[w]hen a plan places the burden on the claimant to provide necessary information, the claimant cannot shift the burden of investigation to the plan administrator." Sahulka v. Lucent Technologies, Inc., 206 F.3d at 769 and see ML00009 (Plan provision placing burden of proof on claimant).

appropriate by MetLife's case manager. ML00736, A-2. However, MetLife was unable to find a rheumatologist in Hillery's area who would perform an IME. See ML00068 to ML00069 (MetLife diary notes). Instead, a MetLife nurse consultant recommended that Hillery's physical capabilities be assessed by a physiatrist to comment on Hillery's ability to perform sedentary to light job duties.[10] ML00069. Hillery was then scheduled for an IME with Dr. Samudrala, Board Certified in Physical Medicine. ML0074.

Dr. Samudrala conducted the IME on July 30, 2003. MetLife supplied Dr. Samudrala with Hillery's medical records as indicated on Dr. Samudrala's report. ML00748, A-5 (noting extensive documents were reviewed). In addition to reviewing Hillery's medical records, Dr. Samudrala examined Hillery for forty-five minutes, considered Hillery's subjective complaints, and conducted a physical examination, motor examination and functional assessment. ML00749 to ML00752, A-6 to A-9. Dr. Samudrala's impression of Hillery's condition was

---

[10] As noted in a prior footnote, "[p]hysiatrists focus on restoring function. They care for patients with acute and chronic pain as well as musculoskeletal problems such as back and neck pain, tendonitis, pinches [sic] nerves and *fibromyalgia*. They also treat people who have experienced catastrophic events that result in paraplegia, quadriplegia, or traumatic brain injury, and individuals who have had strokes, orthopedic injuries, or neurologic disorders such as multiple sclerosis, poliomyelitis, or amyotrophic lateral sclerosis (ALS)." *Lawyers' Medical Cyclopedia of Personal Injuries and Allied Specialties*, Fifth Edition, at §5.2 page 5-4, citing to *American Academy of Physical Medicine & Rehabilitation,* http://www.aapmr.org. (accessed 4/26/01) (emphasis added).

Appellate Case: 05-4000     Page: 32     Date Filed: 01/27/2006 Entry ID: 2003589

consistent with Hillery's treating physicians' impressions (see ML00752, A-9 listing impressions). Dr. Samudrala concluded that Hillery could at least work in a light-duty position and importantly, found that Hillery exhibited Waddell Signs, putting into serious question Hillery's credibility as to her subjective symptoms. ML00751 to ML00752, A-8 to A-9 and see e.g. Hensley v. International Business Machines Corp., 123 Fed. Appx. 534, 539 (4th Cir. 2004) (reasonable for ERISA plan administrator to find that claimant's credibility as to complaints of pain were severely undercut where physical therapist concluded that claimant was engaged in self-limiting behavior and symptom magnification during functional capacity exam).

Not only did Dr. Samudrala's finding agree with Dr. Greenhood's assessment, but her findings are fully supported by Dr. Lumpkins' and Dr. Jares' opinions. Specifically, both Dr. Lumpkins and Dr. Jares conducted detailed reviews of Hillery's medical records and like Dr. Samudrala, concluded that Hillery's subjective complaints were not supported by the objective medical findings. ML00857 to ML00875, A-16 to A-34. Given the consistency in the medical opinions as well as Hillery's own treating physicians' assessments of her physical capabilities, MetLife's use of Dr. Samudrala's IME does not show a serious procedural irregularity such that MetLife "acted dishonestly, acted from an improper motive, or failed to use judgment in reaching its decision." Neumann v.

26

Appellate Case: 05-4000     Page: 33     Date Filed: 01/27/2006 Entry ID: 2003589

AT&T Communications, Inc., 376 F.3d at 781 citing Buttrum v. Central States, S.E. & S.W. Areas Health & Welfare Fund, 76 F.3d at 900.

### 3.    MetLife considered Hillery's treating physicians' opinions.

Hillery also contends that a serious procedural irregularity exists because MetLife allegedly ignored Hillery's treating physicians' opinions.  In support of this contention, Hillery claims that there is overwhelming evidence that Hillery was disabled and that MetLife had no basis for deferring to the opinions of the four independent physicians.  Brief at p. 33-34.  Hillery doesn't cite to any part of the administrative record to support this contention and she cannot, because the record fully supports MetLife's deference to the opinions of the independent  physicians.

First, as noted by the District Court, the opinions of Hillery's treating physicians were not entirely inconsistent with the opinions of MetLife's reviewing physicians.  Rheumatologist Dr. Moore examined Hillery on January 14, 2003 and concluded that Hillery did not have "any lupus activity at this time" and that she should continue using Tylenol on an "as needed basis."  ML00086.  Hillery's treating general physician, Dr. Lamb, completed an Attending Physician's Statement dated January 29, 2003 stating that Hillery could sit for two hours intermittently, stand for one hour intermittently, walk one hour intermittently, lift 10 pounds occasionally and drive a vehicle.  ML00648 to ML00650.  Hillery's last treating rheumatologist (Dr. James Esther) found that Hillery's lupus was

27

controlled by medications and that fibromyalgia and increasing joint tenderness were the most recent concern. ML00849. Dr. Berdy, Hillery's opthamologist, stated that Hillery would only need periodic breaks during an eight-hour day to relieve dry eyes as a result of Hillery's Sjogren's syndrome (ML00808) while Dr. Phillips, an examining neurologist, found that Hillery's examination was "not otherwise impressive for peripheral neuropathy or neuromyopathy." ML00832. Hillery's treating physicians' findings were not dissimilar to MetLife's independent physicians' findings.

More importantly, as a matter of law, MetLife was not required to defer to Hillery's treating physicians' opinions. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 830-831 (2003) (a plan administrator does not have to defer to a treating physician's opinion nor does ERISA impose a heightened burden on an administrator to explain why the treating physician's opinion was rejected). <u>See also</u> <u>McGee v. Reliance Standard Life Ins. Co.</u>, 360 F.3d 921, 925 (8th Cir. 2004) (defendant's decision was not unreasonable when it rejected "the reasoned opinion" of plaintiff's treating physician in favor of independent physician's opinion). The record clearly establishes that the independent medical opinions sought by MetLife were thorough, took into consideration Hillery's treating physicians' medical reports and simply reached a conclusion different from Hillery's treating physicians – that Hillery's medical condition did not render her

Appellate Case: 05-4000    Page: 35    Date Filed: 01/27/2006 Entry ID: 2003589

disabled from any and all occupations.  This difference in opinion and MetLife's

deferral to the independent medical opinions does not create a "serious procedural

irregularity."  <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. at 830-831.

### 4.    <u>MetLife did consider Hillery's subjective complaints.</u>

Hillery's last contention of serious, procedural irregularities is that MetLife

ignored her subjective complaints.  Again, Hillery ignores the evidence in the

administrative record that clearly shows that Hillery's subjective complaints were

considered.  <u>See</u> <u>Coker v. Metropolitan Life Ins. Co.</u>, 281 F.3d 793, 798-799 (8th

Cir. 2002) (finding no abuse of discretion where subjective complaints were

considered but not supported by the objective medical evidence).

As an initial matter, Appellees note that this Court's recent opinion in

<u>Pralutsky v. Metropolitan Life Ins. Co.</u>, _____ F.3d _____, 2006 WL 130935 is

controlling on this issue.  In <u>Pralutsky</u>, MetLife denied Pralutsky's claim for long-

term disability benefits under a plan sponsored by her employer.  <u>Id.</u> at *3.

Pralutsky claimed that a lesser form of the abuse of discretion standard applied

because MetLife allegedly insisted that she provide objective evidence of disability

creating a serious, procedural irregularity.  However, the Court held that a dispute

over whether an administrator has reasonably interpreted a plan to require

objective medical evidence does not create a serious, procedural irregularity.  <u>Id.</u> at

29

*4-5. Thus, as a matter of law, Hillery cannot prove a serious, procedural irregularity by alleging that MetLife required objective evidence of disability.

Moreover, the facts in the record clearly show that Hillery's subjective complaints were considered along with the objective evidence. First, as noted by the District Court, Dr. Samudrala listed ten subjective complaints made by Hillery at her IME. ML00749, A-6. However, Dr. Samudrala found that Hillery's "subjective complaints were out of proportion to the clinic and laboratory findings" and Dr. Samudrala made a specific finding of Waddell Signs. ML00751-ML00752, A-8 to A-9. Likewise, Dr. Jares stated that "[t]here does not appear to be any corroboration of data with regard to [Hillery's] complaints of headaches, cognitive and memory difficulties and balance and coordination difficulties." ML00872, A-31. Dr. Jares then opined that:

> In terms of safety issues, [Hillery] does report subjective symptoms of balance difficulties, falling, coordination abnormalities, and therefore should be restricted from working heights or dangerous machinery. It does not appear that there are any restrictions necessary in terms of operating motor vehicles.

ML00872, A-31.

Dr. Lumpkins also noted Hillery's subjective symptoms in her detailed review of Hillery's medical records but found that "[t]he weight of the impairment documented by [Hillery] in her personal evaluations would appear exaggerated based on the degree of treatment received by the rheumatologists that she has seen

during the duration of her complaints." ML00864, A-23. Thus as properly found by the District Court, Hillery's medical conditions and related complaints were fully considered and, as determined by MetLife, did not support Hillery's claim that she remained Totally Disabled. See Coker v. Metropolitan Life Ins. Co., 281 F.3d at 798-799 (upholding denial of benefits when subjective complaints not supported by objective medical evidence).

Accordingly, as Hillery cannot point to any serious, procedural irregularity, MetLife's decision should be reviewed using the most deferential form of the abuse of discretion standard of review. Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997) (court must affirm if reasonable person could have reached a similar decision); Layes v. Mead Corporation, 132 F.3d 1246, 1250 (8th Cir. 1998) (deferential standard of review reflects court's hesitancy to interfere with administration of benefits plan). In evaluating the reasonableness of MetLife's decision to deny benefits, the Court must determine "whether the decision is supported by substantial evidence, which is more than a scintilla but less than a preponderance." Sahulka v. Lucent Technologies, Inc., 206 F.3d 763, 767-768 (8th Cir. 2000). The Court is not to substitute its weighing of the evidence for that of the administrator. Id. at 769-770. Where the administrator offers a reasonable explanation for its decision, the decision "should not be disturbed even if another reasonable, but different, interpretation may be made."

Fletcher-Merrit v. Noram Energy Corp., 250 F.3d 1174, 1180 (8th Cir. 2001);

Coker v. Metropolitan Life Ins. Co., 281 F.3d at 797.

**C.     The District Court Did Not Err By Finding That MetLife Did Not Abuse Its Discretion When Terminating Hillery's Benefits.**

Hillery presents no real coherent argument as to why this Court should overturn the District Court's decision. Rather, Hillery presents her own version of the facts, claiming that MetLife ignored her subjective complaints of pain, her history of fibromyalgia, her age and her employment history. As fully set forth below, MetLife considered all of this evidence when deciding to terminate Hillery's benefits after her treating physician stated that her lupus was no longer active. And, as properly found by the District Court, MetLife's decision is supported by substantial evidence and does not constitute an abuse of discretion.

As an initial matter, and as noted above, the record clearly shows that Dr. Samudrala, Dr. Greenhood, Dr. Lumpkins and Dr. Jares all considered Hillery's subjective complaints in conjunction with the objective medical evidence. All found that Hillery's subjective complaints were out of proportion to the medical evidence. Furthermore, Dr. Samudrala's finding of Waddell Signs puts Hillery's credibility as to her subjective symptoms in serious doubt. ML00751-ML00752, A-8 to A-9; Hensley v. International Business Machines Corp., 123 Fed. Appx. at 539 (claimant's credibility severely undercut where physical therapist concluded that claimant was engaged in self-limiting behavior and

32

symptom magnification during functional capacity exam). Hillery has no basis for claiming that her subjective symptoms were not considered. Coker v. Metropolitan Life Ins. Co., 281 F.3d at 798-799.

Also, the circumstances of this case show that it was reasonable for MetLife to look for objective evidence as to Hillery's claim that her physical capacity rendered her Totally Disabled. As in Pralutsky, MetLife did not disagree with Hillery's diagnosis. Rather, utilizing four independent medical physicians, MetLife determined that "the medical information provided was insufficient to document that [Hillery's] condition was of a severity to support her inability to perform any gainful occupation." ML00540 to ML00542, A-35 to A-37. These facts do not support Hillery's claim that MetLife arbitrarily ignored her subjective complaints and required objective medical evidence of disability, nor does the case law on this subject support Hillery's position. Pralutsky, ___ F.3d ____, 2006 WL 130935 at *6-7; Hunt v. Metropolitan Life Ins. Co., 425 F.3d 489, 491 (8th Cir. 2005) (per curiam) (denial of benefits reasonable where objective medical evidence did not support subjective complaints of disability from restless leg syndrome and related problems); Coker v. Metropolitan Life Ins. Co., 281 F.3d at 799.

Hillery also implies that MetLife ignored her history of fibromyalgia. However, Dr. Greenhood reviewed Hillery's medical records and noted that

33

Hillery complained of "[p]ain associated with fibromyalgia … "[but that ] … most patients that have fibromyalgia are capable of work in the sedentary to light categories." Id.; Bremer v. Hartford Life and Accident Ins. Co., 16 F.Supp.2d 1057, 1061 (D. Minn. 1997) (affirming denial of long-term disability benefits and citing conclusion by reviewing physician that "[t]here is no evidence in literature that not working has any benefit for people with fibromyalgia"). Dr. Samudrala also considered Hillery's history of fibromyalgia (ML00752) and Hillery's complaints of "body pain" in reaching her conclusion that Hillery was capable of light-duty work. ML000749, A-6; ML00752, A-9. Likewise, Dr. Lumpkins agreed with Dr. Greenhood's opinion that Hillery's history of fibromyalgia would not preclude her from working, stating that "the wealth of the medical *supports minor symptoms affecting myalgias, arthralgias, and fatigue, which while present likely in Ms. Hillery is not of a degree that would prohibit gainful employment of any occupation at least in a sedentary position."* ML00865, A-24 (emphasis added). Again, Hillery's version of the facts is not supported by the administrative record.

Hillary also continues to claim that MetLife did not consider her age and work history in its decision, even though the record is clear on this issue. Following Dr. Samudrala's IME of Hillery, MetLife requested an Employability Assessment Report from analyst Christian B. Camfield. ML00574 to ML00575,

34

A-11 to A-12. The analyst expressly stated in the Employability Assessment Report that Hillery was 54 years old and that she had been disabled since April 6, 1991 due to a diagnosis of SLE. ML00574, A-11. The analyst also noted Dr. Samudrala's conclusion of light-duty work and listed Hillery's daily physical limitations, taken from Dr. Samudrala's Physical Capacity Evaluation. Id. Most importantly, *the analyst referred to Hillery's own statements regarding her work history from 1967 to 1991 in retail sales management. ML00574, A-11.*

For example, upon her initial claim for disability, Hillery submitted a personal profile stating that she had twenty-four years of "retail sales [management]." ML00429. Hillery listed her duties as "sales/display – inventory control, supervising personnel and recruiting, merchandise presentation, stock maintenance, computer, employee relations." Id. Hillery also submitted a Personal Profile to MetLife on January 8, 2003 noting that she had completed a twelfth grade education and had worked from 1986 to 1990 as an area sales manager and from 1990 to 1991 as a manager. ML00626. Hillery also indicated that she had supervisory experience. Id. This information was used by the analyst in completing the Employability Assessment Report (ML00574, A-11). Accordingly, the analyst's statement in the Employability Assessment Report that "[t]his Employability Assessment was completed based on [Hillery's] education,

35

training and experience and considering her potential ability to perform at the Sedentary – Light strength demand" was accurate.[11]

Furthermore, any claim by Hillery that she was not qualified to reenter the workforce is countered by the Plan's broad disability standard. As Hillery concedes, "Total Disability" under the Plan means that a "Participant cannot work at any gainful occupation for which the Participant is reasonably qualified, **or could become qualified, by education, experience or training**. ML00007 (emphasis added). Thus, regardless of Hillery's claim that she was not qualified to reenter the workforce, the Plan's definition of disability takes into account any training or education that Hillery needed in order to become qualified for any of the occupations identified in the Employability Assessment Report.

With no evidence to rely on, Hillery concludes her brief claiming that the record does not support MetLife's decision to terminate benefits. However, the record not only contains an independent medical examination of her physical capabilities by a physiatrist, but also reviews by a rheumatologist, a neurologist

---

[11] Hillery attempts to support her position by pointing to Dr. Greenhood's statement that he thought her prognosis for a return to work was poor based on her length of disability and age (ML00736, A-2). However, the MetLife vocational analyst considered these factors, in addition to Hillery's work history, when completing the Employability Assessment Report and determined that Hillery was capable of employment. ML00574 to ML00575, A-11 to A-12.

Appellate Case: 05-4000     Page: 43     Date Filed: 01/27/2006 Entry ID: 2003589

and a physician specialized in internal medicine and infectious diseases. These records alone are substantial evidence supporting MetLife's decision.[12]

For example, Dr. Greenhood, Board Certified in Internal Medicine and Infectious Diseases concluded that:

> [Hillery] does have lupus, [but] there is no evidence of a recent flare of [the] disease. There is no indication of complications associated with lupus (such as renal dysfunction, severe lung disease, cerebritis, etc.) that would be expected to cause impairment. ***It rather appears as though complaints of pain and fatigue (which are subjective) primarily limit the patient.*** There is no indication of active lupus that explains the pain and fatigue. Presumably, the symptoms are due to fibromyalgia. … [T]here is no documentation that the patient has ongoing, inflammatory arthritis and cognitive difficulty. Pain associated with fibromyalgia is noted. ***However … most patients that have fibromyalgia are capable of work in the sedentary to light categories.***

ML00736 (emphasis added).

---

[12] Hillery concludes her brief by citing to <u>Bowman v. Barnhart</u>, 310 F.3d 1080 (8th Cir. 2002) claiming that the opinions of non-examining physicians do not constitute substantial evidence. However, Bowman is a Social Security case and as noted by the United States Supreme Court, critical differences exist between the Social Security disability program and ERISA benefit plans. <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 832-833 (2003). More importantly, under ERISA, the opinions of non-examining physicians can constitute substantial evidence. See <u>e.g.</u> <u>Hunt v. Metropolitan Life Ins. Co,</u> 425 F.3d at 491 (holding that where opinion of treating physician and opinion of reviewing physician are in conflict, ERISA plan administrator does not commit abuse of discretion by denying claim for disability based on opinion of reviewing physician); <u>McGee v. Reliance Standard Life Ins. Co.,</u> 360 F.3d at 925 (holding that it was not unreasonable for plan administrator to reject opinion of treating physician in favor of opinion of reviewing physician);

Appellate Case: 05-4000    Page: 44    Date Filed: 01/27/2006 Entry ID: 2003589

Dr. Samudrala's independent medical exam also provides substantial evidence supporting MetLife's decision.[13] Dr. Samudrala personally examined Hillery for forty-five minutes and reviewed extensive records sent to her by MetLife and given to her by Hillery. ML00748 to ML00753, A-5 to A-10. Dr. Samudrala concluded that Hillery's subjective complaints were "out of proportion to the clinic and laboratory findings" and that Hillery was capable of light-duty work. ML00582. Dr. Samudrala also completed a Physical Capacities Evaluation, making findings similar to Hillery's treating physicians, that Hillery was able to sit 5 hours per day, stand 2 hours per day and walk 1 hour per day. ML00753, A-10. Dr. Samudrala also concluded that Hillery could lift up to 10 pounds frequently, 20 pounds occasionally and could drive a vehicle. Id.

Dr. Lumpkins, Board Certified in Rheumatology and Board Certified in Internal Medicine, reviewed Hillery's records in detail and agreed that the "medical record supports that [Hillery] would fulfill criteria for a diagnosis of systemic lupus erythematosus that would be based on a positive ANA, complaints of the arthralgia, documentation of rash on the face and loosely arthritis or joint complaints." ML00863, A-22. However, Dr. Lumpkins concluded that:

---

[13] Importantly, Hillery concedes at page 30 of her Brief that "a thorough and complete IME, even if contradictory of a claimant's evidence, can be substantial evidence to support [a] denial of benefits."

38

There are insufficient medical records documenting severity of systemic lupus erythematosus or other arthritic condition limiting function in terms of range of motion, muscle strength, or neurologic abnormalities that would lead to significant impairment preventing Ms. Hillery from being able to perform even sedentary positions. The lack of aggressive treatment by multiple rheumatologists in the intervening 12 years would support that the degree of systemic lupus that Ms. Hillery has suffered is mild-to-marginal at best and not of a disabling degree given that she has not sustained internal organ damage or involvement. ***The wealth of the medical supports minor symptoms affecting myalgias, arthralgias, and fatigue, which while present likely in Ms. Hillery is not of a degree that would prohibit gainful employment of any occupation at least in a sedentary position. From rheumatology perspective, the wealth of the medical record does not support an impairment to preclude Ms. Hillery from performing at least a sedentary occupation.***

ML00865, A-24 (emphasis added).

Dr. Jares, Board Certified in Neurology, also reviewed 461 pages of Hillery's medical records and concluded that Hillery's "history, physical examination, and testing are consistent with a diagnosis of SLE based primarily upon her subjective symptoms and positive ANA." ML00872, A-31. However, after considering the objective medical findings including test results related to Hillery's complaints of pain, Dr. Jares noted that "[t]here does not appear to be any corroboration of data with regard to [Hillery's] complaints of headaches, cognitive and memory difficulties and balance and coordination difficulties." ML00872, A-31. Dr. Jares then opined that:

[f]rom an objective standpoint, the records do not indicate the presence of a neurological process so severe that [Hillery] would be [incapable] of performing her usual occupation or any occupation for

39

that matter. … In terms of safety issues, [Hillery] does report subjective symptoms of balance difficulties, falling, coordination abnormalities, and therefore should be restricted from working heights or dangerous machinery. It does not appear that there are any restrictions necessary in terms of operating motor vehicles.

ML00872, A-31. Dr. Jares' report along with Dr. Greenhood's findings, Dr. Samudrala's examination results and Dr. Lumpkins' analysis, all provide substantial evidence supporting MetLife's decision that Hillery was no longer "Totally Disabled."

Not to be ignored is the fact that Hillery's own treating physicians' records support MetLife's decision. Dr. Moore examined Hillery on January 14, 2003 and concluded that Hillery's lupus was not active. Although Hillery reported to Dr. Moore that she experienced "ongoing joint pain in her knees, left shoulder, and upper back region" (ML00085 to ML00086), on musculoskeletal examination, Dr. Moore found that she had "tenderness of bilateral shoulders, [but] the other joints were free of any tenderness or swelling." ML00086. Dr. Moore's impression was that Hillery did not have "any lupus activity at this time" and that she should continue using Tylenol on an "as needed basis." ML00086.

Dr. Moore's records also reflect the mild nature of Hillery's Raynaud's symptoms and fibromyalgia as he encouraged "precautions against cold weather, restorative sleep and water aerobics." Id. Instead of closely following Hillery's

Appellate Case: 05-4000    Page: 47    Date Filed: 01/27/2006 Entry ID: 2003589

progress, Dr. Moore requested that Hillery follow-up in four months for "further evaluation and recommendations." Id.

Dr. Moore's impressions were not isolated. Hillery's treating general physician, Dr. Lamb, completed an Attending Physician's Statement dated January 29, 2003 listing only systemic lupus erythematosus and peripheral neuropathy as the diagnosed conditions and not fibromyalgia.[14] ML00648 to ML00650. Although Dr. Lamb stated that Hillery was unable to work due to ongoing inflammatory arthritis, chronic pain and cognitive difficulty (ML00650), Dr. Lamb stated that Hillery could sit for two hours intermittently, stand for one hour intermittently and walk one hour intermittently. Id. Dr. Lamb also stated that Hillery could lift up to ten pounds occasionally and could drive a vehicle. Id.

Even over a year later and well after MetLife terminated Hillery's benefits, Hillery's next treating rheumatologist (Dr. James Esther) found that Hillery's lupus was under control. Specifically, Dr. Esther stated that Hillery:

> suffers from systemic lupus, erythematosus, has severe diffuse tendonitis, fibromyalgia, severe Raynaud's phenomenon, Sjogrens syndrome, peripheral neuropathy, arthritis related to her connective tissue disease and sinusitis. She is currently maintained on Bextra 10mg daily. Her joints continue to manifest evidence for seropositive polyarticular SLE. She was initially diagnosed with SLE in 1991. **At the present time she does meet ARA criteria for systemic lupus,**

---

[14] Hillery concedes in her statement of facts that Dr. Lamb concluded that Hillery "primarily suffered from SLE and secondarily from peripheral neuropathy." Brief at p. 16.

Appellate Case: 05-4000     Page: 48     Date Filed: 01/27/2006 Entry ID: 2003589

**her disease is controlled with the use of medications.** Of recent concern is the fibromyalgia and the increasing joint tenderness.

ML00849. As to Dr. Esther's comment on Hillery's recent concern of fibromyalgia and increasing joint tenderness, Dr. Lumpkins agreed that Hillery's medical records support "minor symptoms affecting myalgias, arthralgias, and fatigue, … [but they are] … not of a degree that would prohibit gainful employment of any occupation at least in a sedentary position." ML00865, A-24. MetLife was fully entitled to defer to Dr. Lumpkins' conclusion. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830-831 (2003) (a plan administrator does not have to defer to a treating physician's opinion).

Moreover, Hillery's medical records regarding her diagnosis of Sjogren's syndrome and neuropathy are not supportive of her claim of Total Disability. For example, Dr. Berdy, Hillery's opthamologist, stated that Hillery would only need periodic breaks during an eight-hour day to relieve dry eyes as a result of Hillery's Sjogren's syndrome. ML00808. Also, Dr. Phillips, an examining neurologist, found that Hillery's examination results were "not otherwise impressive for peripheral neuropathy or neuromyopathy." ML00832. Hillery's treating physicians' findings were not dissimilar to MetLife's independent physicians' findings and support MetLife's decision to terminate benefits.

Accordingly, with no basis for her version of the facts, Hillery's attempt to overturn the District Court's decision must be rejected. MetLife fully considered

Appellate Case: 05-4000    Page: 49    Date Filed: 01/27/2006 Entry ID: 2003589

her subjective complaints in conjunction with the objective medical evidence. As well, MetLife considered her age and employment history. And most importantly, MetLife sought independent medical opinions as to Hillery's diagnosis, condition and physical capacities when considering whether Hillery was Totally Disabled as defined under the Plan. Given that the record in this matter presents substantial evidence such that a reasonable person could reach the same decision as MetLife, the District Court's decision should be affirmed. Cash v. Wal-Mart Group Health Plan, 107 F.3d 637, 641 (8th Cir. 1997) (court must affirm if reasonable person could have reached a similar decision); Layes v. Mead Corporation, 132 F.3d 1246, 1250 (8th Cir. 1998) (deferential standard of review reflects court's hesitancy to interfere with administration of benefits plan).

## VI.  CONCLUSION

For the foregoing reasons, Defendants-Appellees The Limited Long-Term Disability Program and the Metropolitan Life Insurance Company respectfully request that this Court affirm the District Court's holdings in all respects.

43

Appellate Case: 05-4000     Page: 50     Date Filed: 01/27/2006 Entry ID: 2003589

Respectfully Submitted,

ARMSTRONG TEASDALE LLP

VORYS, SATER, SEYMOUR AND
PEASE LLP

BY: _____

BY: _____

Ann E. Buckley
One Metropolitan Square,
Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 621-5065 (facsimile)

David A. Campbell
Michael J. Settineri
Vorys, Sater, Seymour and
Pease LLP
52 East Gay Street
Columbus, Ohio 43215
Phone:  (614) 464-6400
Fax:  (614) 719-5146

ATTORNEYS FOR
DEFENDANT-APPELLEE
METROPOLITAN LIFE
INSURANCE COMPANY

ATTORNEYS FOR
DEFENDANT-APPELLEE
THE LIMITED LONG-TERM
DISABILITY PROGRAM

44

# VII. CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 27, 2006, a true and accurate paper copy of the foregoing and an electronic pdf file of the foregoing was served by U.S. Mail upon Gregory A. Oliphant, Esq., 1001 Craig Rd., Suite 305, St. Louis, MO 63146, counsel of record for Plaintiff-Appellant Sandra S. Hillery.

_____
Ann E. Buckley
Armstrong Teasdale LLP
One Metropolitan Square, Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 621-5065 (facsimile)

# VIII. CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

The undersigned hereby certifies that:

1)      This brief complies with Fed. R. App. P. 32(a)(7)(B) because the brief contains 11,187 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2)      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2002 in Times New Roman font, 14-point typeface for the text.

Respectfully Submitted,

ARMSTRONG TEASDALE LLP

VORYS, SATER, SEYMOUR AND PEASE LLP

BY: _____

Ann E. Buckley
One Metropolitan Square,
Suite 2600
St. Louis, Missouri 63102-2740
(314) 621-5070
(314) 621-5065 (facsimile)
abuckley@armstrongteasdale.com

BY: _____

David A. Campbell
dacampbell@vssp.com
Michael J. Settineri
mjsettineri@vssp.com
Vorys, Sater, Seymour and
Pease LLP
52 East Gay Street
Columbus, Ohio 43215
Phone:  (614) 464-6400
Fax:  (614) 719-5146

ATTORNEYS FOR
DEFENDANT-APPELLEE
METROPOLITAN LIFE
INSURANCE COMPANY

ATTORNEYS FOR DEFENDANT-
APPELLEE THE LIMITED LONG-
TERM DISABILITY PROGRAM